# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiffs, <br><br> vs. <br><br> KRISTA PARKER and CHARLES NEIL PARKER, <br><br> Defendants. | 8:18CR301 <br><br> ORDER <br> and <br> FINDINGS AND RECOMMENDATION |

This matter is before the Court on the Motion to Sever ([Filing No. 50](#)) and Motion to Suppress ([Filing No. 48](#)) filed by Defendant Charles Neil Parker ("Charles"); and the Motion to Sever ([Filing No. 53](#)) and Motion to Suppress ([Filing No. 55](#)) filed by Defendant Krista Parker ("Krista"). Defendants filed briefs in support of the Motions to Sever ([Filing No. 51](#); [Filing No. 54](#)) and Motions to Suppress ([Filing No. 49](#); [Filing No. 56](#)). The government filed briefs in opposition to the Motions to Sever ([Filing No. 61](#)) and Motions to Suppress ([Filing No. 62](#)).

The Court held an evidentiary hearing on the motions on February 21, 2019. Charles was present with his attorney, Mark W. Bubak, and Krista was present with her attorney, David Stickman. The government was represented by Assistant United States Attorney, Kelli Ceraolo. Omaha Nation police officers, Jeremy Gilpin and Benjamin Carrillo, testified on behalf of the government. The Court received into evidence, without objection, Exhibits 101-102 offered by Krista, Exhibit 103 offered by Charles, and Exhibit 1 offered by the government. A transcript (TR.) of the hearing was prepared and filed on February 23, 2019. ([Filing No. 69](#)). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge denies Defendants' motions to sever, without prejudice, and recommends that Defendants' motions to suppress be denied.

## BACKGROUND

Defendants are each charged in a three-count Indictment with kidnapping, felony child abuse/neglect, and false imprisonment involving a minor Indian child, C.H., during the period of

January 1, 2018, to September 15, 2018, within the exterior boundaries of the Omaha Nation Indian Reservation in the District of Nebraska. ([Filing No. 24](#)).

Jeremy Gilpin, a police officer with the Omaha Nation Law Enforcement Services, testified that he was on duty on September 15, 2018, when he received a report[1] from a Cheyanne Freemont at approximately 2:00 a.m. regarding her observation of a young male child locked in a room in the basement while at a party at Krista and Charles' house where everyone had been drinking. (TR. 14-16). Ms. Freemont stated that the basement door was locked from the outside and that when she opened the door an alarm went off. After she saw the child and heard the alarm she became panicked and scared and shut the door so the alarm would go off. Ms. Freemont told Officer Gilpin that there was nothing in the room except concrete floor and a blanket. According to Officer Gilpin, Ms. Freemont was crying and very upset because she recognized the child from one of her classes at the Omaha Nation School. (TR. 16-17). Ms. Freemont stated that the child had a disability and she was concerned about neglect because she knew the school had made prior reports to the child abuse hotline regarding this child. (TR. 41, 45).

Based on Ms. Freemont's report, Officer Gilpin, Sergeant Benjamin Carrillo, and Officer Simmonds went to Krista and Charles' residence at approximately 2:20 a.m. to do a welfare check. When the officers arrived at the residence, they saw multiple vehicles and an intoxicated couple standing outside the garage, which was open. The couple stated there were no children at the residence. (TR. 18, 46). Officer Gilpin testified that he knocked on the front door to the residence and someone opened it from the inside and let him in. Officer Gilpin observed multiple people in the living room and kitchen area, alcoholic beverages on table counters and floor, and a person that appeared to be passed out on the couch. (TR. 19-20). Sergeant Carrillo knocked on the door to the residence from the garage, but the individuals inside did not open the door for him. (TR. 30). The woman standing outside the garage when officers arrived then helped Sergeant Carrillo gain access to the residence from the garage. (TR. 46-47).

After entering the residence, Sergeant Carrillo began looking for the child and located him in a dark basement utility room that had no carpet or drywall and had a bad "porta-potty" odor. The door to the room was locked and had an alarm. (TR. 48-49, 59). Sergeant Carrillo testified

---

[1] Officer Gilpin first took Ms. Freemont's statement by telephone and then went to speak to her in person at her mother's residence. (TR. 15).

that the child was clothed and did not look physically injured but was crying and smelled like urine. The child also stated he was hungry. (TR. 54-56, 59-60, 63). Sergeant Carrillo took the child out of the room and sat him down on some furniture in the basement while Sergeant Carrillo checked the basement bedrooms and advised the other officers he located the child. Sergeant Carrillo asked the other officers to start giving everyone breathalyzers and to take intoxicated individuals into protective custody.[2] (TR. 20-21, 50). Sergeant Carrillo stayed inside the residence with the child to wait for child and family services to arrive while the other officers removed the adults from the residence. (TR. 50-51). After all adults were removed from the residence, Sergeant Carrillo and housing security officers closed and locked windows and doors to secure the residence. (TR. 62-63). Child and family services arrived at the police department instead of the residence, so Sergeant Carrillo took the child from the residence to the police department to meet them. (TR. 51-52). Krista was taken into protective custody. (TR. 21).

After the officers left the residence, Lieutenant Bertucci asked Officers Gilpin and Simmonds to return to the residence to secure it for a search warrant and advised them that Charles "was back up at the residence." (TR. 22-23). When Officers Gilpin and Simmonds returned to the residence, Officer Simmonds saw movement inside the kitchen, but no one answered the front door. Officer Gilpin went to the back of the residence and knocked on the window and shined his flashlight at Ronnie Miller, Jr. and Tim Grant, whom Officer Gilpin recognized and knew did not live there. (TR. 23). Ronnie opened the sliding glass back door for Officer Gilpin, who reentered the residence to see if anyone else was inside and to verify if Charles was there. (TR. 24). Four individuals, none of them Charles, were removed from the residence. (TR. 37-38, 42). Officer Gilpin called FBI Agent Steve Friend for direction, and Agent Friend advised Officer Gilpin to take photographs of the residence since Gilpin was already inside; Officer Simmonds then took pictures inside the residence. (TR. 24-25, 35). No search warrant for the residence was ever obtained. (TR. 30-31). Both defendants have now moved for separate trials and to suppress any

---

[2] Pursuant to tribal ordinance, officers may bring intoxicated individuals within the boundary of the reservation into protective custody. (TR. 21).

3

evidence[3] obtained from the warrantless entries into their home and any subsequent statements they made.[4]

The government asserts that the Defendants are properly joined for trial and that both warrantless entries into Defendants' residence were lawful under exigent circumstances and the community caretaking function of the officers, and that all evidence and statements obtained as a result are admissible.

## DISCUSSION

### I. MOTIONS TO SEVER

Both Defendants move for severance under Federal Rule of Criminal Procedure 14. While "[t]here is a preference in the federal system for joint trials of defendants who are indicted together," *Zafiro v. United States*, 506 U.S. 534, 537 (1993), Fed. R. Crim. P. 14(a) provides that if joinder "appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Properly joined defendants should be severed under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. The defendant seeking severance carries a heavy burden and "must show 'real prejudice,' that is, 'something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." *United States v. Mickelson*, 378 F.3d 810, 817 (8th Cir. 2004))(*quoting United States v. Oakie*, 12 F.3d 1436, 1441 (8th Cir. 1993)).

Neither defendant challenges joinder under Fed. R. Crim. P. 8(b). Instead, they argue a joint trial would be prejudicial under Fed. R. Crim. P. 14. Krista argues that a joint trial would violate her Sixth Amendment right to confront witnesses against her based on her inability to confront or cross-examine Charles regarding his statements that C.H. is occasionally locked in the

---

[3] Krista separately moves to suppress the results of a warrantless Preliminary Breath Test ("PBT"). Filing No. 55 at p. 1; Filing No. 56 at pp. 4-5. The government does not intend to present such evidence at trial. Filing No. 62 at p. 11. Therefore, the undersigned need not address this argument.

[4] Krista contends that any statements she made are derived from unconstitutional searches and seizures. See Filing No. 55 at p. 2; Filing No. 56 at p. 5. Charles, however, did not expressly move for the suppression of any post-*Miranda* statements.

basement storage room to protect their daughters and to allow him to "calm down" to avoid lashing out; that C.H. is normally is locked in storage for "a few hours or so;" that "there may have been a time that [C.H.] might have been there for a night;" and that the storage room door is locked when C.H. is confined. See Exhibit 102. Likewise, Charles argues that he would be prejudiced should any of Krista's statements be introduced during a joint trial without being provided an opportunity to cross-examine her. The government argues that Charles' statements are not directly incriminatory to either defendant and that Krista's statements do not incriminate Charles. The government asserts that, to the extent any prejudice exists, it can be cured by redaction and a limiting jury instruction.

In *Bruton v. United States*, 391 U.S. 123 (1968), the United States Supreme Court held that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987)(citing *Bruton*, 391 U.S. at 135-36)). However, *Bruton* is inapplicable where a codefendant's statement does not incriminate the defendant on its face. See *United States v. Gayekpar*, 678 F.3d 629, 637 (8th Cir. 2012)(citing *Richardson v. Marsh*, 481 U.S. 200, 208 (1987)). "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211. Thus, "[w]here a defendant's redacted confession does not refer directly to the codefendant himself, and becomes incriminating only in combination with other evidence, the Constitution permits the normal presumption that a jury will follow an instruction to disregard the confession when considering a verdict for the codefendant." *Gayekpar*, 678 F.3d at 637.

The Court concludes that neither Defendants' statements require severance under *Bruton* because they are not facially incriminatory. Krista's statements do not implicate Charles on their face. Although no recording of Krista's interview was offered as evidence, the Court determines as much based upon Defendants' statements as reported by the interviewing law enforcement officer, Agent Friend. (Ex. 102, 103). With respect to Charles' statements, he does not refer to any specific wrong-doing. Moreover, most of his statements do not mention Krista by name or otherwise implicate her as being involved in the specific behavior described. Charles' statement

5

that they "check on C.H. periodically during his confinement" can be redacted by omitting any reference to Krista. At most, the remaining statements tend to inculpate either defendant only when considered with other evidence received at trial. The Eighth Circuit and other circuits have upheld defendants' statements "so long as the redacted confession or admission does not facially incriminate or lead the jury directly to the nontestifying declarant's codefendant." *United States v. Edwards*, 159 F.3d 1117, 1125 (8th Cir. 1998). Therefore, *Bruton* is not applicable. See *Gayekpar*, 678 F.3d at 637. The Court finds that redaction of Charles' statements in conjunction with a limiting instruction avoids the necessity of severance.[5] Neither defendant has met the high standard required for severance or a finding that redaction or a limiting instruction would be insufficient to avoid prejudice. Thus, the defendants may remain joined for trial at this time.

## II. MOTIONS TO SUPPRESS[6]

Krista and Charles argue that the officers' first warrantless entry into their residence was not excused by exigent circumstances. (Filing No. 49 at p. 2; Filing No. 56 at p. 2). "Absent voluntary consent or exigent circumstances, police may not enter a private home to conduct a warrantless search." *United States v. Yeager,* 731 F. App'x 545, 547 (8th Cir. 2018)(citing *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006)). The "emergency aid" and "community caretaking" exceptions are two such exigent circumstances. *Burke v. Sullivan*, 677 F.3d 367, 371 (8th Cir. 2012). These exceptions are similar, but not identical. *Id.* Under the emergency aid exception, officers may enter a home without a warrant when they have "an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Id.* (quoting *Ryburn v. Huff*, 565 U.S. 469, 473 (2012)). Under the community caretaker exception, "[a] police officer may enter a residence without a warrant . . . [when] the officer has a reasonable belief that an emergency exists requiring his or her attention." *Id.* (quoting *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006)). The reasonable belief standard "is a less exacting

---

[5] However, a recording of Charles' interview was received as Exhibit 101. Charles makes statements that, taken together with other evidence, may be incriminatory and uses the word "we" several times. It may not be possible to sufficiently redact these portions of the recording. For that reason, Krista may again raise the issue of severance should the government or Charles elect to offer the recording of Charles' interview as trial evidence.

[6] The Bill of Rights does not apply to Indians on Indian Land. *United States v. Lester*, 647 F.2d 869, 872 (8th Cir. 1981). However, the Indian Civil Rights Act (ICRA), 25 U.S.C. § 1302(a)(2), "parallels the fourth amendment" and therefore the undersigned magistrate judge will nevertheless consider the motions under Fourth Amendment standards. See *id*.

standard than probable cause." *Id.* "If officers have an objectively reasonable basis that some immediate act is required to preserve the safety of others or themselves, they do not also need probable cause." *United States v. Quarterman*, 877 F.3d 794, 800 (8th Cir. 2017)(citation omitted). An officer's subjective intent is irrelevant "as long as the circumstances, viewed objectively, justify [the] action." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006)(alteration in original)(quotation omitted).

The undersigned magistrate judge concludes that, based on the information known to the officers, it was objectively reasonable for them to conclude their warrantless entry into Krista and Charles' home was lawful under the community caretaker exception. In this case, Officer Gilpin received a report from an extremely upset and crying individual at 2:00 a.m. regarding her observation of a handicapped child locked in a dark, empty basement room armed with an alarm. The reporting individual recognized the child and knew there had been previous incidents of neglect involving the child. The reporting individual informed officers that she was at the residence for a party where everyone had been drinking. When officers arrived, there were multiple vehicles out front and two intoxicated individuals outside the residence denied that there were any children at the residence. The reporting party was concerned in making her report because she had been consuming alcohol and did not want to be arrested herself, but nevertheless wanted to talk to an officer in person about what she had seen. (TR. 39-40). The undersigned considers that, when viewed objectively, these circumstances provided officers with reasonable basis to believe that emergency existed requiring their attention to preserve the safety of the child. Because exigent circumstances existed, officers did not need a warrant to enter the residence, and any subsequent evidence or statements obtained as a result of this entry do not need to be suppressed.

Krista and Charles argue that, even if exigent circumstances permitted law enforcement's first warrantless entry into the residence, the second warrantless entry into the residence was certainly unlawful because the child had already been removed from the home and therefore any evidence obtained as a result of the second entry must be suppressed. (Filing No. 49 at p. 3; Filing No. 56 at p. 4). The record reflects that the only evidence obtained by law enforcement from the second entry into the Defendants' residence were photographs taken of areas in the house that law enforcement had viewed during the first entry.

The plain view doctrine allows an officer to seize, without a warrant, an item (1) that is in plain view, (2) while observed from a lawful vantage point, and (3) its incriminating character is immediately apparent. *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008). Once lawfully inside a home, police may seize obviously incriminating items that are in plain view. *United States v. Chipps*, 410 F.3d 438, 442-43 (8th Cir. 2005). Generally, recording "visual images of a scene by means of photography does not amount to a seizure because it does not meaningfully interfere with any possessory interest," and therefore officers can lawfully "record by photography scenes presented to their plain view." *Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir.1992); see also *United States v. Espinoza*, 641 F.2d 153, 167 (4th Cir. 1981)(finding that an officer lawfully on the premises during the execution of a search warrant did not exceed the scope of the warrant by taking the photographs of what he saw in plain view). The plain view doctrine encompasses photographs taken of evidence in plain view "to that extent seizing those views themselves as evidence." *Espinoza*, 641 F.2d at 167.

"Courts have been willing to allow officers to seize evidence based on the plain view exception when the police reenter a home and retrieve evidence that they viewed during an initial search based on exigent circumstances." *United States v. Hill*, 2011 WL 1486023, at *9 (D. Minn. Mar. 31, 2011), *report and recommendation adopted*, No. CRIM. 11-15(1) DWF, 2011 WL 1483782 (D. Minn. Apr. 19, 2011)(citing *Harris v. Ford*, 369 Fed. Appx. 881, 888 (10th Cir. 2010)). Such re-entry is characterized as a continuation of the first entry, even if no officer from the first entry remains on the scene. See *id.*; see also *People v. Martin*, 2003 WL 22221964, *4-*5, (Mich. Ct. App. Sept. 25, 2003)("[W]hen police officers enter a private residence pursuant to exigent circumstances and observe evidence in plain view but do not seize the evidence, a subsequent warrantless entry shortly after the first entry to process evidence that could have legally been seized by the officer who first viewed the evidence does not violate the Fourth Amendment[.]"). Additionally, officers are permitted to secure access to an area to be searched "[f]or purposes of officer safety and to prevent the destruction of incriminating evidence[.]" See *United States v. Bausby*, 720 F.3d 652, 657 (8th Cir. 2013)(citing *United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997)).

In this case, after the child and intoxicated individuals were removed from the residence, officers returned shortly thereafter to secure the residence. (TR. 37). After the officers re-entered Defendants' residence, they proceeded to remove four more individuals. Securing a crime scene

and preventing destruction of evidence justifies the officers' re-entry into the residence within a short period of time after exiting the residence. See *Bausby*, 720 F.3d at 657. The officers then photographed the interior of the house. The officers did not expand the scope or nature of their initial entry, and only took photographs of the interior of the residence that they had lawfully viewed in plain sight during the justified entry into the residence pursuant to exigent circumstances. The undersigned concludes that, once legally inside the residence, the officers were not required to leave the residence to get a search warrant to take such photographs of areas viewed in plain sight during the officers' justified entry into the residence. It would have been unreasonable to expect the officers to take the photographs during their first entry into the residence because the officers were preoccupied with finding the child, believing that he was in danger. The officers' second entry into the residence occurred a relatively short period of time after officers first left the residence to transport intoxicated individuals and after Sergeant Carrillo had left with the child. Under the circumstances, the undersigned concludes that the photographs taken during the second entry into the Defendants' home do not need to be suppressed.

Krista only objects to her statements as fruit of the unlawful warrantless entries into the residence. Because the undersigned magistrate judge concludes the warrantless entries were lawful, Krista's motion to suppress her subsequent statements obtained as a result of such entries also should be denied.

In sum, the undersigned magistrate judge concludes that exigent circumstances existed permitting law enforcement to enter the residence without a warrant, and that any evidence or statements obtained as a result of such entries do not need to be suppressed.

Upon consideration,

**IT IS ORDERED** that Defendant Charles Neil Parker's Motion to Sever (Filing No. 50) is denied and Defendant Krista Parker's Motion to Sever (Filing No. 53) is denied, without prejudice; and

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert F. Rossiter, Jr., that Defendants' Motions to Suppress (Filing No. 48 and Filing No. 55) be denied.

Dated this 25th day of March, 2019.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Order and Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Order and Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.